# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| GWENDOLYN L., | ) |
|         Plaintiff | )<br>)<br>) |
| v. | )    No. 1:18-cv-00272-JDL |
| NANCY A. BERRYHILL,<br>*Acting Commissioner of Social Security,* | )<br>)<br>)<br>) |
|         Defendant | )<br>) |

## REPORT AND RECOMMENDED DECISION[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge ("ALJ") supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks remand on the bases that the ALJ erred in determining her mental residual functional capacity ("RFC") and in addressing post-hearing vocational evidence that a person with her IQ scores would not be able to perform the jobs identified by a vocational expert ("VE") at hearing. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (ECF No. 12) at 3-13. I conclude that remand is warranted on the basis of the ALJ's handling of the post-hearing evidence and, accordingly, recommend that the court vacate the commissioner's decision and remand this case for further proceedings consistent herewith. I need not and do not reach the plaintiff's challenge to the determination of her mental RFC.

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement. Oral argument was held before me pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

1

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the ALJ found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2018, Finding 1, Record at 17; that she had the severe impairments of degenerative disc disease and headaches, Finding 3, *id.*; that she had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she was able to understand, remember, and apply information and focus on and complete simple work-related tasks, maintain concentration, persistence, or pace for simple work activities, manage simple social demands, adapt to routine changes and manage herself, and was limited to an environment with moderate noise, Finding 5, *id.* at 19; that, considering her age (41 years old, defined as a younger individual, on her alleged disability onset date, June 17, 2013,), education (at least high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 7-10, *id.* at 22; and that she, therefore, had not been disabled from June 17, 2013, her alleged onset date of disability, through the date of the decision, August 31, 2017, Finding 11, *id.* at 23-24. The Appeals Council declined to review the decision, *id.* at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Sec'y of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support

the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The ALJ reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Sec'y of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

### A. Background

At the request of the commissioner, the plaintiff underwent a psychological review by agency examining consultant Donna M. Gates, Ph.D., on April 16, 2015, and a psychological evaluation by Dr. Gates on December 21, 2016. *See* Record at 527-31, 640-44. In 2015, Dr. Gates conducted a clinical interview and mental status examination, diagnosed the plaintiff with cognitive disorder, and concluded, in relevant part, that, "[b]ased on [the plaintiff's] presentation style, intellectual functioning was estimated to be in the low-average range." *Id*. at 527, 530-31. She concluded that the plaintiff could "follow work rules, relate well to others, and use good judgment on the job" and "likely could manage a mild level of work-related stress and function independently on simple tasks if she were physically capable of doing so[,]" although "she ha[d] significant issues with memory[.]" *Id*. at 530-31.

In 2016, Dr. Gates noted that the plaintiff "had an unremarkable mental status examination, other than mistaking her age[,]" with intellectual functioning again estimated to be in the low-average range "[b]ased on her presentation style[.]" *Id*. at 642. However, she noted that "[f]ormal testing" in the form of administration of the Wechsler Adult Intelligence Scale-IV "placed [the

plaintiff] in the borderline range of intellectual ability[,]" *id*. at 642-43, with a verbal comprehension index IQ of 80 and a full-scale IQ of 77, *see id*. at 643. She stated that the plaintiff "made a good effort across and within subtests" and that "[t]he current test results appear to be an accurate reflection of her intellectual ability." *Id*. She diagnosed the plaintiff with both cognitive disorder and borderline intellectual functioning and concluded, *inter alia*, that her "judgment [wa]s expected to be good for jobs within her vocational ability[,]" she had "intermittent symptoms" causing "difficulty processing information and communicating[,]" and she may "have difficulty learning new tasks due to intermittent lapses." *Id*. She also completed a separate mental RFC assessment, checking boxes indicating that the plaintiff had mild restrictions in understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions. *See id*. at 651.

The ALJ found that the plaintiff retained the mental RFC to, among other things, understand, remember, and apply information and focus on and complete simple work-related tasks, maintain concentration, persistence, or pace for simple work activities, and adapt to routine changes. *See* Finding 5, *id*. at 19. He noted that a vocational expert ("VE") present at the plaintiff's hearing had testified that a person with the plaintiff's age, education, work experience, and RFC could perform the representative jobs of mail sorter, *Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed., rev. 1991) ("DOT") § 209.687-026, order caller, DOT § 209.667-014, and retail marker, DOT § 209.587-034. *See id.* at 22-23; *see also id*. at 45-46.

At hearing, the plaintiff's counsel asked the VE what aptitudes were required for the jobs at issue. *See id*. at 48. The VE inquired, "Are you talking about the GOE?" *Id*.[2] The plaintiff's counsel responded, "Yes. General learning, yeah, just overall aptitude levels." *Id*. The VE

---

[2] The commissioner represents that "GOE" stands for "*Guide for Occupational Exploration*." Defendant's Opposition to Plaintiff's Itemized Statement of Errors ("Opposition") (ECF No. 15) at 1, 10 n.7.

responded that for the mail sorter it was 754, for the order caller, 593, and for the retail marker, 593. *See id*. The plaintiff's counsel stated that he had no further questions. *See id*.

At the close of hearing, the plaintiff's counsel requested and was granted an opportunity to submit a post-hearing statement. *See id*. at 49. Counsel submitted a letter to which he attached materials that included an affidavit of a different VE, David W. Meuse, M.S., CRC, a reprint of a journal article by Arthur R. Jensen titled *Test validity: g versus the specificity doctrine*, and letters dated March 28, 2014, and October 31, 2014, from psychologist Barbara J. McKim, Ph.D. *See id*. at 374-89.

Mr. Meuse stated that, in his professional opinion, "a level of ability in both General Learning Ability (intelligence) and Verbal Ability, as a result of" a full-scale IQ of 77 and a verbal IQ of 80, placing a person in the 7th and 9th percentiles, respectively, in those abilities, "would be very limiting" and would rule out the mail sorter, order caller, and retail marker jobs identified by the VE at hearing, all of which require General Learning and Verbal abilities above the lowest 10th percentile. *Id*. at 377. He added that the numbers supplied by the VE at hearing in response to the plaintiff's counsel's question regarding the aptitudes for those three jobs were "not responsive to the question regarding aptitudes." *Id*.

Mr. Jensen wrote, "The fact that the GATB [General Aptitude Test Battery] Aptitude *G* is a good measure of the g factor, or general intelligence, is shown by its average correlation of 0.80 with 12 well-known standard tests of IQ[.]" *Id*. at 384. Dr. McKim stated that, in her opinion, "the Full Scale IQ score is apt to be most closely commensurate with general learning ability, as it assesses aspects of both verbal and performance abilities." *Id*. at 387 .

The ALJ addressed the plaintiff's post-hearing submission as follows:

> The representative'[s] argument regarding the [plaintiff]'s full scale IQ of 77 by
> Dr. Gates is given little weight. The [plaintiff] argues that she would be unable to

5

> perform even basi[c] jobs due to her being in the 7th percentile. However, no source, treating or otherwise, other than the one time examination by Dr. Gates, has suggested the [plaintiff] has intellectual difficulties. The suggestion is also inconsistent with the [plaintiff]'s semi-skilled past relevant work history. Additionally, an [ALJ] may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one-time exam. Ch[u]nn v. Barnhart, 397 F.3d 667 (8th Cir. 2005).

*Id*. at 21.

### B. Analysis

The plaintiff contends that the ALJ failed to address the substance of the Meuse affidavit or otherwise offer a rationale supported by substantial evidence for discrediting the post-hearing submission. *See* Statement of Errors at 6-13. The commissioner rejoins that (i) the plaintiff's premise that IQ scores equate with aptitude percentiles is legally and factually flawed, (ii) to accept her argument would encourage claimants to avoid cross-examining the VE in favor of procuring purportedly uncontradicted post-hearing vocational evidence, and, (iii) in any event, the ALJ provided a sufficient rationale, supported by substantial evidence, for rejecting the plaintiff's claim that her IQ scores rendered her incapable of performing the jobs the VE identified. *See* Opposition at 6. The plaintiff has the better argument.

#### 1. Adequacy of ALJ's Handling of Post-Hearing Vocational Evidence

I turn first to the ALJ's rejection of the post-hearing evidence, concluding that it is unsupported by substantial evidence. First, while the ALJ stated that no source other than Dr. Gates had suggested that the plaintiff had intellectual difficulties, and cited *Chunn* for the proposition that an ALJ *may* reject IQ scores, he did not make clear whether he rejected the Gates IQ score finding. *See* Record at 21. Indeed, at Step 2, he explained that he gave great weight to Dr. Gates' opinion not only because she was a treating source (although she was an examining source) but also because he deemed her opinion "consistent with the [plaintiff]'s full scale IQ score of 77 found during psychological testing." *Id*. at 18 (citation omitted). In the circumstances, as

6

the plaintiff argues, *see* Statement of Errors at 12, *Chunn* cuts in her favor: the *Chunn* court remanded that case because "the ALJ did not explicitly reject the psychologist's opinion [regarding the claimant's IQ], much less explain why her opinion should not be relied on[,]" *Chunn*, 397 F.3d at 672.[3]

Second, while the ALJ stated that the suggestion that the plaintiff had intellectual difficulties was inconsistent with her semi-skilled past relevant work history, *see id*. at 21, that has no bearing in this case, the plaintiff having alleged that she developed the symptoms at issue, including "memory loss and some expressive aphasia[,]" after becoming ill at work in 2013, *id*. at 640. There is no dispute that the plaintiff has engaged in no substantial gainful activity since June 17, 2013, her alleged onset date of disability. *See* Finding 2, *id*. at 17.

Third, to the extent that the ALJ meant to find the plaintiff's IQ scores inconsistent with her daily activities and behavior, he did not explain why, *see id*. at 21, and his earlier discussion of her activities does not fill the gap. At Step 2, he had stated that the plaintiff's activities were "not limited to the extent one would expect" given her complaints of disabling symptoms and limitations, noting that she had reported that she was "able to care for her animals, perform personal hygiene on a daily basis, prepare meals, and do general housework." *Id*. at 20 (citation omitted). However, it is not self-evident that those activities are inconsistent with Dr. Gates'

---

[3] The commissioner contends that the ALJ adequately took the plaintiff's IQ scores into account by adopting the mental RFC opinion of Dr. Gates, the very same source who administered the IQ testing, a proposition for which she cites *Bowie v. Colvin*, No. 2:12-cv-205-DBH, 2013 WL 1912913, at *10 (D. Me. Mar. 31, 2013) (rec. dec., *aff'd* May 7, 2013). *See* Opposition at 16-18. Nonetheless, as the plaintiff's counsel rejoined at oral argument, in *Jenkins v. Colvin*, Civil No. 1:14-cv-285-DBH, 2015 WL 5093290 (D. Me. Aug. 28, 2015), Judge Hornby clarified that a VE's testimony concerning the impact of IQ scores and general learning ability on a claimant's capacity to perform certain jobs addresses the question of "whether there were available jobs in the national economy for a person with specified characteristics, not . . . whether the claimant actually exhibited any particular characteristic." *Jenkins*, 2015 WL 5093290, at *2; *see also id*. at *3 (VE's testimony "that a person with the limitations in the ALJ's hypotheticals could perform three jobs, but that a person who had those same limitations and was also within the bottom 10% of intellectual functioning could not[,]" was not inherently contradictory).

7

finding that she had borderline intellectual functioning, as reflected in her full-scale IQ score of 77.

Fourth, and finally, as the plaintiff notes, *see* Statement of Errors at 9-10, the ALJ did not directly address the substance of the Meuse affidavit, *see* Record at 21.

For all of these reasons, the ALJ's treatment of the plaintiff's post-hearing submission is not supported by substantial evidence. Because the Meuse opinion, if accepted, would be outcome-determinative, the error warrants remand. To the extent that the commissioner argues that the court, nonetheless, should refrain from remanding this case because the plaintiff's IQ theory is fundamentally flawed and because remand in these circumstances would promote inefficiency in the administrative process, those arguments are unpersuasive for the reasons discussed below.

### 2. Asserted Fundamental Legal, Factual Flaws in Plaintiff's Position

The commissioner first objects to remand of this case on the basis that the plaintiff's theory that her IQ scores equate with her aptitude is fundamentally flawed both as a legal and a factual matter. She asserts that "courts across the country have rejected the notion that IQ scores are a proxy for aptitudes" and that no evidence of record, including the Meuse affidavit, links the plaintiff's scores to *her* aptitude. Opposition at 6-7.

At oral argument, the plaintiff's counsel rejoined that these are impermissible *post hoc* rationalizations, a proposition for which he cited *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). *See Day v. Astrue*, No. 1:12-cv-141-DBH, 2012 WL 6913439, at *10 (D. Me. Dec. 30, 2012) (rec. dec., *aff'd* Jan. 18, 2013) (Pursuant to the *Chenery* rule, "a reviewing court cannot affirm an agency's decision on the basis of a *post hoc* rationalization but must affirm, if at all, on the basis

of a rationale actually articulated by the agency decision-maker.") (citation and internal quotation marks omitted).

In response, counsel for the commissioner argued that his client was not attempting to justify the ALJ's decision on a fresh basis but, rather, to point out that the predicate to the plaintiff's challenge is untenable as a matter of law. *See, e.g., Day*, 2012 WL 6913439, at *10 ("An exception to the *Chenery* rule exists when a remand will amount to no more than an empty exercise because, for example, application of the correct legal standard could lead to only one conclusion.") (citation and internal punctuation omitted).

The plaintiff has the better argument. As Judge Hornby noted in *Jenkins*, "[t]he case law demonstrates that there is disagreement over whether and to what degree general learning ability and IQ are interchangeable." *Jenkins*, 2015 WL 5093290, at *2 n.9. The commissioner cites no case law of the Supreme Court, the First Circuit, or this court holding that, as a matter of law, IQ scores cannot serve as proxies for aptitudes. *See* Opposition at 6-12. Thus, it cannot fairly be said that, following remand in this case, there could only be one conclusion on this point as a matter of law.[4]

This, in turn, is dispositive of the commissioner's argument that the plaintiff's post-hearing evidence is fundamentally flawed as factual matter. Absent resolution of the predicate legal question of the type of evidence, if any, that a claimant must produce to establish a link between her IQ and her aptitude, it cannot fairly be said that, on remand, there could be only one conclusion as to the adequacy of the plaintiff's showing.

---

[4] As the commissioner notes, this court has observed that "a holding that an IQ score is *per se* disabling" would be inconsistent with the so-called "Listings," Appendix 1 to Subpart P, 20 C.F.R. § 404. Opposition at 8 (quoting *Davenport v. Berryhill*, No. 1:16-cv-00420-NT, 2017 WL 2731304, at *6 (D. Me. June 25, 2017) (rec. dec., *aff'd* Sept. 29, 2017)). However, that begs the question of the circumstances in which IQ evidence can be material to the question of disability.

### 3. Asserted Public Policy Implications of Plaintiff's Approach

The commissioner next, and finally, invokes public policy concerns as a basis to refrain from remanding this case. *See id.* at 12-19. She contends that accepting the plaintiff's argument would have "broad detrimental policy implications that would undermine the efficacy of the administrative process" because the plaintiff "has attempted to force a remand . . . by proffering 'undisputed' vocational evidence from her own vocational specialist only because of her counsel's ineffective cross-examination of the vocational expert at the administrative hearing." *Id.* at 12. Regardless of the merit of this point in general, in this case, the plaintiff's counsel sought and was granted an opportunity to submit a post-hearing statement, to which he appended vocational evidence that was entered into the record and discussed by the ALJ. *See* Record at 21, 49, 374-89. That decision, of course, is subject to judicial review in its entirety. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

## II. Conclusion

For the foregoing reasons, I recommend that the commissioner's decision be **VACATED** and the case **REMANDED** for proceedings consistent herewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 11th day of June, 2019.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge
